## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WORKCO, INC. d/b/a TOKU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1334-JTL |
| | ) | |
| LIQUIFI, INC. and BENJAMIN SNIPES, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER ADOPTING
### SPECIAL DISCOVERY MAGISTRATE'S REPORT

WHEREAS:

A.       On February 6, 2025, WorkCo., Inc. d/b/a Toku ("Toku") moved to compel LiquiFi, Inc. to apply Toku's proposed search terms to identify responsive documents.

B.       On March 7, 2025, the court appointed a Special Discovery Magistrate.

C.       On April 8, 2025, the Special Discovery Magistrate a report recommending denying Toku's Motion To Compel Defendants To Apply Search Terms And Collect Documents From The Relevant Period.

D.       No party has taken exceptions to the Special Discovery Magistrate's recommendation.

IT IS HEREBY ORDERED:

1.       Toku's motion is denied on the basis of the Special Magistrate's report.

2. The court adopts the report, attached as Exhibit A, as a ruling of the court.

3. The parties must continue to cooperate in identifying any additional targeted searches that may become necessary as forensic analysis progresses.

Vice Chancellor Laster
April 21, 2025



# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WORKCO, INC. d/b/a TOKU,     )
    )
       Plaintiff,     )
    )
    )
    v.     )
    )   C.A. No. 2024-1334-JTL
LIQUIFI, INC. and BENJAMIN     )
SNIPES,     )
    )
       Defendants.

### SPECIAL DISCOVERY MAGISTRATE'S REPORT
### RECOMMENDING DENYING
### PLAINTIFF'S MOTION TO COMPEL DEFENDANTS TO APPLY SEARCH TERMS
### AND COLLECT DOCUMENTS FROM THE RELEVANT PERIOD

Date Submitted: April 8, 2025

**Tara Emory, Special Discovery Magistrate**

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff WorkCo., Inc. d/b/a Toku ("Toku") has moved to compel Defendant LiquiFi, Inc. ("LiquiFi") to apply Toku's proposed search terms to identify responsive documents. By Order dated March 7, 2025, Vice Chancellor Laster appointed me as Special Discovery Magistrate to facilitate resolution and submit this Report.

This discovery dispute, and the subsequent search process to resolve it, demonstrates an evolution from ineffective "go fish" keyword searches to a methodical, collaborative, and effective approach aligned with the case's specific information needs.

The case involves claims of misappropriation of trade secrets and confidential information. Toku alleges that its former in-house attorney Benjamin Snipes ("Snipes") became discontented in March 2024 and, before his departure in July 2024, downloaded over 25,000 files

containing Toku's confidential information and trade secrets. Compl., D.I. 1, ¶¶ 3, 12, 60-66. Snipes was hired by LiquiFi in September 2024. Toku claims he shared its intellectual property with LiquiFi, including information relating to a real-time tax calculation engine for cryptocurrency-based compensation and a token-based pricing model. Id. ¶¶ 12-14, 67-82. Of particular significance is Toku's allegation regarding a "prompt" questionnaire, such as "LiquiFi x Ben Snipes Prompt," that Toku claims LiquiFi used when hiring Snipes to determine whether it would disclose Toku trade secrets. Id. ¶¶ 4-7, 13, 74-82. Toku alleges similar prompt documents were used when it later hired another Toku employee, Kirk Alcock ("Alcock"). Id. ¶¶ 83-89. Toku further alleges that LiquiFi is using that information to compete unfairly and has made untrue statements that disparage Toku. Id. ¶¶ 91-94.

On January 8, 2025, Toku served its first set of requests for production. The parties attempted to negotiate but did not agree on culling search terms or the relevant time period for the document search. LiquiFi applied its selected search terms, reviewed those documents for relevance, and produced 332 documents. Plaintiff's Motion to Compel Defendants to Apply Search Terms and Collect Documents from the Relevant Period "Motion to Compel" or "Pl.'s Mot."), D.I. 74, ¶¶ 2, 10. LiquiFi declined to apply Toku's more extensive proposed search terms, or to include documents from a broader time period identified as relevant by Toku. Defendant LiquiFi, Inc.'s Opposition to Pl.'s Mot. ("Def.'s Opp."), D.I. 82, ¶¶ 8-10. On February 6, 2025, Toku filed the Motion to Compel, which sought to have LiquiFi run its requested search terms, provide a hit report for those terms, and then, without any additional relevance review, produce all documents that hit on the terms. Pl.'s Mot. ¶¶ 21-25. The motion was resolved as to Mr. Snipes on February 28, 2025, in an Order that withdrew Plaintiff's Motion for Contempt of the Status Quo Order Against Snipes. D.I.107.

2

This Report focuses on LiquiFi's methodology for searching and identifying responsive documents within its corporate data sources for the agreed categories of information. Some aspects of discovery in this matter are proceeding through separate processes and are outside the scope of this Report. These include forensic examinations of devices and systems to identify the 25,000 files allegedly taken by Snipes, forensic analysis to identify any deleted files, analysis of Snipes' personal devices, and certain categories of documents related to damages but not relevant to these preliminary injunction proceedings.

## II. THE PRIOR SEARCHES AND APPOINTMENT OF SPECIAL DISCOVERY MAGISTRATE

Throughout January and early February 2025, counsel for the parties met and conferred regarding search terms. Pl.'s Mot. Exs. 3, 4, 5. LiquiFi's counsel provided hit count reports for dozens of search term strings. Negotiations focused on search term hit volumes rather than search effectiveness. While this is a traditional approach to addressing eDiscovery searches, each party's proposed search terms were ultimately shown to be ineffective in finding a reasonable amount of relevant documents. Notably absent from the parties' discussions were considerations of alternative search methodologies or validation of search effectiveness.

Applying its selected search terms and other targeted searches for documents dated from September 1, 2024 through February 2025, LiquiFi reviewed in excess of 12,000 documents but produced only 332, with a resulting responsiveness rate of under 3%. Def's Opp. ¶ 10. For documents in the March 1 to August 31, 2024 range, which Toku requested to be included, LiquiFi sampled the set, with Toku's proposed search terms applied, and reported that the results were less than 1% responsive (though it did not provide a margin of error or size of its sample). Id. ¶ 12. It accordingly declined to search or produce from that set based on low responsiveness.

3

Based on statistical sampling, it has since been determined with 95% confidence that the overall richness (responsiveness rate) of LiquiFi's documents from March 1, 2024-February 2025 lies in a range from about 2.5% to 3%. In other words, both parties' search terms performed about as well as a random selection from the documents. As we also now know, LiquiFi's production represented less than 4% of the responsive documents in LiquiFi's data set (a metric referred to as "recall"). LiquiFi's approach failed to recognize that even in document sets with low richness, significant numbers of responsive documents may exist.

In its March 7, 2025 Order Appointing a Special Discovery Magistrate, the Court held that the relevant time period for search should include March 1, 2024 to present D.I. 122, ¶ 1. The Order further noted that it did not appear "that the defendants have made a reasonable effort to identify responsive documents," and that "[c]onducting a meaningful search for responsive documents is not so simple as merely applying the plaintiff's search terms. That is the equivalent of 'go fish'"[1] Id.

Following the briefing of Toku's Motion to Compel and prior to my appointment as Special Discovery Magistrate, LiquiFi retained Troutman Pepper Locke ("Troutman") as new counsel. Troutman implemented effective search methodologies, and together with Toku's counsel Quinn Emanuel, the parties cooperated to resolve the challenges to LiquiFi's search

---

[1] For many years, initial search terms have been referred to in caselaw and the eDiscovery industry as "Go Fish" searches, referring to the child's game in which a player asks for a card, hoping they will be lucky – often unsuccessfully, resulting in being told to "go fish" for another card. *See Da Silva Moore v. Publicis Groupe & MSL Group*, 287 F.R.D. 182, 190-191 (S.D.N.Y. 2012) (S.D.N.Y. 2012) ("In too many cases, however, the way lawyers choose keywords is the equivalent of the child's game of 'Go Fish'"), *citing* Ralph C. Losey, "Child's Game of 'Go Fish' is a Poor Model for e-Discovery Search," Adventures in Electronic Discovery 209-10 (2011) and *citing William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("This Opinion should serve as a wake-up call to the Bar in this District about the need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce emails or other electronically stored information").

4

raised in Toku's Motion to Compel, and led to LiquiFi's production of over 8,000 responsive documents (over 9,500 total, when including not-responsive family documents).

## III. LEGAL STANDARD

Under Court of Chancery Rule 26(b)(1), parties may obtain discovery regarding "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The scope of discovery under this rule is broad and far-reaching. See *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *1 (Del. Ch. 2017) (noting that "[r]elevance must be viewed liberally" and discovery should be permitted if "there is any possibility that the discovery will lead to relevant evidence").

Established legal frameworks recognize a producing party's discretion to choose their own production methodologies. The Sedona Conference Principle 6 acknowledges that "responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 SEDONA CONF. J. 1, 118 (2018). This principle recognizes that the producing party has unique access to and knowledge of its own data environment.

This principle, however, does not relieve the producing party of its obligation to conduct reasonable searches for responsive information. The corollary to The Sedona Conference Principle 6 is that a responding party must take care that its process is reasonably designed to lead to production of relevant evidence. Particularly where the parties have not agreed otherwise, the responding party should not rely on a requesting party's proposed terms as the sole method for finding responsive documents, nor should it simply reject those terms without evaluating

their reasonableness or alternative options. Even where a responding party has demonstrated that the requesting party's proposed search terms are ineffective, the responding is not relieved of its obligation to develop search methods that are reasonably designed to identify responsive information.

## IV. ALIGNMENT OF SEARCH METHODOLOGY WITH SEARCH GOALS

### A.    Ineffective Initial Approaches

Before a responding party determines its search methodology, it should first analyze what types of information it is seeking, and which search approaches are likely to be most appropriate for locating that information. Here, both parties defaulted to empirically-blind search term negotiations, resulting in an inefficient process. The parties debated about unproductive search terms. LiquiFi then conducted an inefficient and ineffective review based on search terms. Toku's Motion to Compel has requested relief based on more inefficient search terms. Neither party initially considered whether search terms were the optimal approach for the information sought.

In their negotiations, Toku requested broader terms, believing, without evidence, that its approach was reasonable to retrieve the relevant information it sought. Meanwhile, LiquiFi interpreted low search term hit rates for Toku's proposed search terms and time period as proof of absence of responsive documents. In actuality, neither conclusion served the goal of conducting a reasonably effective search.

As the Court held in the Order of my appointment, and evidenced by LiquiFi's subsequent search process, the initial production process was deficient. LiquiFi did not represent that it had attempted to test, iteratively develop, or validate its search terms. The 3% responsiveness rate resulting from the review of the documents hitting on LiquiFi's initial search

6

demonstrated that the terms were at minimum inefficient, and there was no empirical evidence that the terms were reasonably designed to find responsive documents. Further, LiquiFi did not demonstrate that the burden of additional search would be disproportionate to the needs of the case because it did not identify any specific burdens based on reasonable attempts to design effective searches. Efforts spent on conducting unreasonable search and review processes do not count in the consideration of burden to a party.

In addition, LiquiFi's finding that Toku's requested search terms were only 1% responsive (precision rate) as applied to the March-August 2024 dates did not justify abandoning the search effort. While a reasonable search would seemingly require LiquiFi to at least consider Toku's requested searches, Toku's ineffective "go fish" search terms did not excuse LiquiFi from its duty to produce responsive documents.

LiquiFi supplemented its existing data sets with additional collections from custodial devices and noncustodial LiquiFi data, including Google shared drives, Telegram, Notion, and Slack.

## B.    Cooperating on Scope of Search Topics

Through the Special Discovery Magistrate process, in a series of meetings, the parties identified and agreed to the scope of categories of relevant information for which LiquiFi should search. Framing the negotiation this way shifted the parties' discussion from debating search term syntax to focusing on substantive information needs.

As is common in discovery, while Toku's Requests for Production were numerous and detailed, the parties did not initially share a common understanding on the scope of relevant topics. For example, Toku wanted information about LiquiFi's hiring practices for positions other than those filled by Snipes and Alcock. While that information potentially fell within several of

7

Toku's requests, LiquiFi's prior search and review had not considered that a relevant topic. By focusing discussion on information categories rather than search terms, they developed a shared understanding of concepts from which LiquiFi could develop targeted and appropriate searches.

The parties' initial, mismatched expectations about the scope of relevance illustrates an important factor in discovery search negotiations: the parties' interpretations of responsiveness are inherently subjective and may differ significantly, even when both parties are acting in good faith. LiquiFi's prior limited production may have reflected not just ineffective search methodology, but also a genuine misunderstanding of what information Toku considered responsive to its requests for production. By discussing topics rather than isolated search terms, the parties established a clearer, shared understanding of what information would be relevant to the claims and defenses in this case, avoiding potential future disputes over whether documents were improperly withheld. *See*, e.g., *Winfield v. City of New York*, 2017 WL 5664852 at *9 (S.D.N.Y. 2017) (ordering Defendant to expand its search and production because its interpretation of relevance had been too narrow).

Through cooperative discussion, the parties agreed the topics to be searched related to:

1. LiquiFi's sending and receipt of competitive information from potential hires;
2. "Prompt" documents used in hiring processes (as explained above);
3. Real-time tax calculators; and
4. Disparagement of Toku.

### C.   Designing Effective Searches

In designing and executing a reasonable search, parties have several tools available to them, beyond search terms. Different search approaches can work better for different types of information. After the parties agreed on scope of relevant topics, LiquiFi thoughtfully designed

8

searches to align with the specific information needs, using a combination of search techniques involving metadata, targeted and highly responsive search terms as determined through sampling, and Technology-Assisted Review (TAR).

1. **Communications with or involving specific individuals**: Given the significance of former Toku employees Snipes and Alcock in this matter, and the potentially different nature of documents related to them from before versus after they worked at LiquiFi, the parties agreed that LiquiFi's search would include:

   o Prior to their respective hiring dates, all communications involving LiquiFi and Snipes or Alcock. This search was based on only email and phone metadata.

   o Search terms for discussions related to Snipes and Alcock from prior to their hiring dates, which were tested though sampling. Terms demonstrating low success and high burden were abandoned or refined. Search terms with higher success and lower burden were applied. For example, Kirk Alcock's first name was determined to be a reasonable search term and was applied, while Ben Alcock's first name was determined to be disproportionately burdensome and unreasonable as a search term in this data set.

2. **Other LiquiFi documents**: With the search categories established, and with consideration for input from Toku, LiquiFi developed the following search methods for documents not addressed by the Snipes and Alcock searches:

   a. **Potential Hires**: LiquiFi identified the names of individuals who were considered as potential hires during the relevant time frame. Using their names, contacts and dates, LiquiFi conducted targeted searches for this

9

information. In addition, several targeted searches for discussions related to hiring were developed, tested and implemented.

b. **"Prompt" Documents**: Searches were tailored to include file name searches for "prompt." In addition, search terms were used, involving quoted language from the known prompt documents. For any prompt documents located, LiquiFi agreed to also determine whether prior versions might also exist on its systems.

c. **Real-time Tax Calculators**: The search for information related to real-time tax calculators involved using a combination of high-precision search terms, and relied on TAR to find additional documents.

d. **Disparagement**: The parties agreed that searching for "Toku," "WorkCo" and "WorkDAO" would reasonably identify most documents that involved disparagement of Toku or other relevant discussions.

e. **TAR**: As mentioned above, to complement the targeted searches, LiquiFi used TAR to find additional responsive documents.

## V. RESULTS AND VALIDATION

Given the expedited nature of this case, LiquiFi worked to produce documents daily until the search and production process was complete. Its search strategy that combined targeted searches with TAR demonstrates the value of tailoring search techniques to the categories of information to be sought.

LiquiFi shared information about the number of documents produced for each topic, which provided transparency, resulting in Toku's agreement that the searches were reasonable. In all, LiquiFi produced 9,426 documents, of which 8,267 were responsive (the remainder being

10

family documents that were not responsive). The responsive document production included 3,948 documents resulting from metadata and targeted search terms, and 4,319 from the use of TAR.

Based on samples of the unreviewed population of documents, the recall of LiquiFi's search, which involved multiple search techniques, is estimated to range between 88% and 98%, to a 95% confidence level (meaning we can be 95% certain the actual value falls within this range). That is a stark contrast to the initial production, which was indeed deficient and represented under 4% recall. In addition to sharing metrics underlying the recall calculation, LiquiFi shared the number of produced documents produced relevant for each topic for which it searched. The results reflect that significant volumes of documents were produced for each topic, suggesting the reasonable effectiveness of the search strategies for those topics.

The validation of the searches with statistical sampling illustrates why such sampling is essential to effective discovery. The initial approach, which relied on untested search terms, missed approximately 96% of responsive documents. Without testing and iterative revision of search terms, and validation through sampling, this deficiency would have remained unknown. Even in low-richness data sets (here, likely under 3%), significant volumes of responsive documents may exist, and may be identified through a thoughtful search strategy.

## VI. CONCLUSION AND RECOMMENDATIONS

LiquiFi has now implemented a reasonable search protocol tailored to the information sought and proportional to the case's needs.

Effective searching in electronic discovery requires parties to focus on fishing where the fish are, rather than simply trying to cast wider nets with more search terms. Toku correctly identified deficiencies in LiquiFi's initial production. However, its Motion to Compel, which

11

demanded that LiquiFi produce documents with Toku's chosen search terms, reflected the same misunderstanding as LiquiFi about search term effectiveness. This approach would have resulted in an inefficient, burdensome process unlikely to identify substantially more responsive documents.

Both parties' cooperation in developing topic-based search strategies proved effective and ensured that the parties shared a common understanding about what documents would be responsive. By first aligning on the scope of discovery topics rather than search techniques, then designing targeted methodologies appropriate to each information category, the discussions moved beyond ineffective search terms, to achieve more comprehensive results.

As the parties proceed with other fact discovery, they should remain ready to address new information that may require additional targeted searches and productions. This is particularly important given the nature of the allegations in this case, where new information may lead to discovery of other responsive materials that, even if not obviously relevant at this stage, could become significant as the case progresses. For example, if the forensic analysis demonstrates that certain Toku documents were in LiquiFi's environment, then the parties should collaborate to identify additional searches that may help further identify if that information was used by LiquiFi.

Accordingly, I recommend that the Court:

1. Deny Toku's Motion to Compel Defendants to Apply Search Terms and Collect Documents from the Relevant Period; and

2. Direct the parties to continue their cooperation in identifying any additional targeted searches that may become necessary based on new information, as forensic analysis progresses.

12

Respectfully submitted,

*/s/ Tara S. Emory*
Tara Emory
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

Special Discovery Magistrate

Date: April 8, 2025